*379 ZAGER, Justice
(dissenting).
I respectfully dissent. The question presented in this appeal is whether the State offered sufficient evidence to support the jury’s finding that Rooney “enter[ed] an occupied structure ” as defined by Iowa Code section 702.12 (2011). Iowa Code § 713.1 (emphasis added). Specifically, we must determine whether there was sufficient evidence to support either of two alternative definitions of “occupied structure” contained in the jury instruction given to the jury by the district court. See Iowa Code § 702.12. Because I believe there was substantial evidence to support the jury’s verdict on either of the two alternative definitions of occupied structure, I would affirm the decision of the court of appeals and the judgment of the district court.
Iowa Code section 713.1 states:
Any person, having the intent to commit a felony, assault or theft therein, who, having no right, license or privilege to do so, enters an occupied structure, such occupied structure not being open to the public, or who remains therein after it is closed to the public or after the person’s right, license or privilege to be there has expired, or any person having such intent who breaks an occupied structure, commits burglary.
(Emphasis added.)
In turn, Iowa Code section 702.12 defines the statutory term “occupied structure” as:
[A]ny building, structure, appurtenances to buildings and structures, land, water or air vehicle, or similar place adapted for overnight accommodation of persons, or occupied by persons for the purpose of carrying on business or other activity therein, or for the storage or safekeeping of anything of value.
In determining whether an alleged burglar entered what constitutes an occupied structure under Iowa Code section 702.12, we apply a two-prong test. State v. Sanford, 814 N.W.2d 611, 616 (Iowa 2012). ‘“The first [prong] describes the type of place that can be the subject of burglary, and the second considers its purpose or use.’” Id. (quoting State v. Pace, 602 N.W.2d 764, 769 (Iowa 1999)). “[A]ny building, structure, appurtenances to buildings and structures, land, water or air vehicle, or similar place” satisfies the first prong of section 702.12. Iowa Code § 702.12; accord Sanford, 814 N.W.2d at 616. The house in this case is clearly a structure. Thus, the issue here is whether the purpose prong of the definition found in section 702.12 has been satisfied.
“The second prohg of section 702.12 requires us to consider the purpose or use of the place in question.” Sanford, 814 N.W.2d at 616. Purposes or uses that make a particular place an occupied structure within the meaning of section 702.12 are whether the place is “adapted for overnight accommodation of persons, or occupied by persons for the purpose of carrying on business or other activity therein, or for the storage or safekeeping of anything of value.” Iowa Code § 702.12; accord Sanford, 814 N.W.2d at 616. Here, the State does not claim the house in this case was occupied by persons for the purpose of carrying on business or other activity, and the district court did not provide the jury with this alternative. Rather, the district court only provided the jury with the remaining two alternative definitions of occupied structure. Thus, we must determine whether there was substantial evidence to support the jury’s finding that this house was either adapted for overnight accommodation of persons or used for the storage or safekeeping of anything of value. See Iowa Code § 702.12. On this record, viewing the evidence in the light most favorable to the State, there is substantial evidence to support the jury’s find *380 ing that the house is an occupied structure under either alternative given to the jury. See Sanford, 814 N.W.2d at 615 (recognizing that in determining whether there is substantial evidence to support a verdict, we consider “all of the record evidence viewed ‘in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence/ ” (quoting State v. Keopasaeuth, 645 N.W.2d 637, 640 (Iowa 2002))).
Turning to the adapted-for-overnight-accommodation alternative, there was substantial evidence to support a finding that the house in this case is an occupied structure. The statute does not require a showing that the place in question is currently inhabited. See Iowa Code § 702.12. Rather, the adapted-for-overnight-accommodation alternative focuses on the intended use or nature of the structure itself. See Commonwealth v. Nixon, 801 A.2d 1241, 1247-48 (Pa.Super.Ct.2002) (holding determination of whether a finished but uninhabited house trailer was adapted for overnight accommodation should turn on “the nature of the structure itself and its intended use, and not whether the structure is. in fact inhabited”); Blankenship v. State, 780 S.W.2d 198, 206, 209-10 (Tex.Crim.App.1989) (en banc) (holding there was sufficient evidence to support jury’s determination that the rental house was adapted for overnight accommodation when at the time of the burglary the structure was unoccupied, had not been lived in or rented for two years, and had the utilities turned off). In Blankenship, the Texas Court of Criminal Appeals stated:
[W]hat makes a structure “suitable” or “not suitable” for overnight accommodation is a complex, subjective factual question fit for a jury’s determination. Their inquiry could be guided by reference to whether someone was using the structure or vehicle as a residence at the time of the offense; whether the structure or vehicle contained bedding, furniture, utilities, or other belongings common to a residential structure; and whether the structure is of such a character that it was probably intended to accommodate persons overnight (e.g. house, apartment, condomiriium, sleeping car, mobile home, house trailer).
780 S.W.2d at 209 (emphasis added). Clearly, the structure in this case was sufficiently adapted for overnight accommodation. More importantly, whether a particular structure is adapted for overnight accommodation is a fact-intensive question for a jury to decide.
Quintessentially, a house is a structure adapted for overnight accommodation. See Pace, 602 N.W.2d at 773 (“The house clearly met the definition of an ‘occupied structure.’ ”); Webster’s Third New International Dictionary 1096 (unabr. ed.2002) (defining a “house” as “a structure intended' or used for human habitation”). Thus, viewing the evidence in the light most favorable to the State, the nature of the structure itself strongly supports a finding that this structure was adapted for overnight accommodation. The majority, however, goes to great lengths to conclude that this house is not a structure adapted for overnight accommodation. In support of its argument, it cites the facts that the city boarded up the structure to keep people out, that the structure had no electricity or running water, that the structure was falling apart, that the city had already decided to demolish the structure, that a contract of demolition of the structure had been approved, and that destruction of the structure was imminent. All of these facts may tend to show that no one was current ly occupying the structure. However, these facts have little to do with whether the structure is adapted for overnight accommodation, something for which a house is intrinsically adapted. The majority has *381 to concede that the house was at some time adapted for overnight accommodation. The majority then proceeds to decide, in its own judgment, when the structure lost its character as a structure adapted for overnight accommodation. Of course, the majority can’t provide any real guidance as to exactly when this happened, just that it did.
Many places that are adapted for overnight accommodation do not have electricity or running water and may be boarded up or not used for a significant period. Examples include camping structures such as tents, campers, or trailers, many of which do not have electricity or running water. It could be an abandoned mobile home on a farmstead. Some shacks, hunting cabins, and even some homes or motels may not possess modern amenities associated with overnight accommodation by some members of our society. See Robert L. Kidder & John A. Hostetler, Managing Ideologies: Harmony as Ideology in Amish and Japanese Societies, 24 Law & Soc’y Rev. 895, 904 (1990) (noting that many Amish homes are “free from electricity”). Nevertheless, these structures are clearly adapted for overnight accommodation. It defies common sense and logic to think that anyone would interpret our burglary statutes so narrowly to say that if someone unlawfully entered any one of these occupied structures, to commit a theft therein, this does not constitute a burglary. This cannot be what the legislature intended in enacting the burglary statute.
Moreover, the majority minimizes evidence in the record that shows this house was actually being used for overnight accommodation. The State presented testimony from a neighbor who stated that her husband had run a few people off the property in the months prior to November 4. She further testified that the house had been broken into a number of times and that she frequently observed instances when the doors of the house were wide open. One of the firefighters who was initially dispatched to the scene testified that “there were multiple spots where it appeared that possibly at one time there had been transients living in it.” The majority minimizes this evidence characterizing it as “consistent with” nonhabitable uses and “speculative.” Maybe. But the majority neglects to mention testimony from the Community Development Project Coordinator for the City of Council Bluffs. She testified that prior to the break-in on November 4 she had contacted the emergency homeless shelter to board up the site, indicating there may have been an ■issue with overnight use of the premises by members of the homeless community. In my opinion, coupled with the fact that a house is a place intrinsically adapted for overnight accommodation, this evidence was sufficient to support the jury’s verdict that this structure was adapted for overnight accommodation.
At its core, the majority’s legal analysis gerrymanders the adapted-for-overnight-accommodation requirement into an abandonment defense. Under its analysis, a house is a house until it is no longer used for human habitation, i.e., abandoned. Yet, if our legislature had wanted to adopt. an abandonment defense, it could easily have done so as have other states. See, e.g., Conn. Gen.Stat. Ann. § 53a-104 (West, Westlaw through Jan. 1, 2015) (“It shall be an affirmative defense to prosecution for burglary that the building was abandoned.”); 18 Pa. Cons.Stat. Ann. § 3502(b)(1) (West, Westlaw through 2014 Reg. Sess.) (“It is a defense to prosecution for burglary if ... at the time of the commission of the offense ... [t]he building or structure was abandoned.”); 9 Guam Code Ann. § 37.20(a) (West, West-law through May 23, 2014) (“It is an affir *382 mative defense to prosecution for burglary that the property, or building, or motor vehicle was abandoned.”); accord Model Penal Code § 221.1(1), 10A U.L.A. 498 (2001) (“It is an affirmative defense to prosecution for burglary that the building or structure was abandoned.”). Whether our State should adopt such an affirmative defense to the crime of burglary is a policy determination for our legislature, not this court.
I turn now to the used-for-the-storage- or-safekeeping-of-anything-of-value alternative. Here, too, I believe the State offered sufficient evidence to support the jury’s verdict. In a cursory fashion, the majority concludes, “At the time of the alleged crime, there was simply no evidence that the city had adapted or modified the structure for use to store or to keep safe anything of value.” This is clearly erroneous. Contrary to the majority’s assertion, the record shows that the city used the house for the storage and safekeeping of several things of value. The Community Development Project Coordinator testified that the house contained “special historic features that were left in the property that [the City was] maintaining.” She testified that several items in the house were of historical significance, namely some elements of carpentry, such as the fireplace mantel. She also testified that the city made efforts to board up the property, and that when she received reports that “the property was wide open” or that “boards were removed,” she would “call people and have them secure the site.” When asked by the State if “the City of Council Bluffs continue[d] to take an interest in th[e] property right up until the time it was demolished?” she responded, “Yes. Yes.” On cross-examination, she testified that she got a call from the historic society on the day the building was demolished “and they wanted to know if they could still get in there.” It cannot be reasonably disputed that the city was attempting to safeguard the contents of the house.
One of the firefighters who was initially dispatched to the scene testified that he had investigated multiple metal thefts. He further testified that based on his investigation, “It appeared that ... wire had been tried to [be] remove[d from the house]; and where they couldn’t exactly remove it from the wall, they just cut it, took what they could, basically stripping the house for copper.” He also testified that it appeared as if someone had entered the house and removed several of its cast-iron radiators. Based on his experience, he testified that copper has a value of approximately “$8.11 a pound” and that cast iron sells for approximately “$200 per ton.”
This record shows the house contained items of both historical and monetary value and that the city took affirmative steps to protect its interests by boarding up the house. When the city discovered that unauthorized individuals had entered the house, it took action to resecure the site. The city had an interest in securing the property up until the time it was actually demolished, and until the time the property was demolished, the city was engaged in conversations with community members who were interested in obtaining items from the property. In my opinion, this is sufficient to support a jury finding that the house was being used for the storage or safekeeping of valuable things.
The majority supports its analysis by making the following observation:
[T]he activity or purpose prong requires more than the mere fact there is some scrap that might be ripped out of. a dilapidated building with some marginal economic value. If this were true, every structure that contained a nail or a *383 screw or a plank might be an occupied structure under the statute.
The majority misses the point. First, there doesn’t have to be a completed act. See Iowa Code § 713.1. The clear language of the statute only requires the “intent to commit a felony, assault or theft.” Id. Just as with many of our criminal statutes, it is not necessary the defendant complete the act. See id.; see also id. § 711.1 (“It is immaterial to the question of guilt or innocence of robbery that property was or was not actually stolen.”). Moreover, here we do have the completed act of a theft. Second, there does not have to be anything of value contained within the structure. See Iowa Code § 702.12. If the purpose of the structure is for the storage or safekeeping of property, it is an occupied structure as defined in the statute, regardless of what is contained inside or its value. See id. Moreover, here the house did contain items of historical and monetary significance. This is evidenced not only by the above-mentioned testimony of the city employee and the firefighter, but also by the fact that Rooney actually committed the crime of theft by taking the cast-iron radiators from the house. The only people who apparently consider these cast-iron radiators worthless are the majority. The City of Council Bluffs, a firefighter, the State, the jury, and even Rooney (by his actions) disagree.
The majority is correct in that the burglary statute is primarily designed to protect people from the risks associated with entries into structures where certain types of dangerous interactions are likely to occur. See Sanford, 814 N.W.2d at 618. Nevertheless, in determining whether a particular structure is an occupied structure within the meaning of the statute, the statute does not require us to engage in a case-by-case risk analysis. See Iowa Code § 702.12; id. § 713.1. This risk is already accounted for in the statute through graduated degrees of burglary based on the risks involved. See State v. Rubino, 602 N.W.2d 558, 564 (Iowa 1999) (recognizing the graduated nature of first-, second-, and third-degree burglary and noting that with respect to first-degree burglary “[t]he risk of harm to persons distinguishes the crime and elevates it in terms of proof and severity of punishment from second- or third-degree burglary”). Thus, in -writing the burglary statute, the legislature made these risk-based, policy determinations such that the burglary statute reflects a judgment that corresponds with the potential risk of harm to persons. True, as in this case when a house is arguably no longer actually used for purposes of human habitation, there is less risk the dangerous interactions the law seeks to deter will occur. And as in this case when it appears that individuals are not often frequenting a given structure because there is arguably little of value contained therein, there is less risk the dangerous interactions the law seeks to deter will occur. However, under the statute a person may be convicted of burglary despite the fact that the risk of a dangerous interaction is relatively low. See Iowa Code § 702.12 (“Such a structure is an ‘occupied structure ’ whether or not a person is actually present.”). Compare id. § 713.3 (requiring presence of “one or more persons” to sustain conviction for first-degree burglary), and id. § 713.5(1)(6) (requiring presence of “one or more persons” when burglar does not possess an “explosive or incendiary device or material, nor a dangerous weapon” to sustain conviction for second-degree burglary), with id. § 713.6A (not requiring presence of one or more persons to sustain conviction for third-degree burglary). The law accounts for this decreased risk in the form of decreased proof requirements and punishments, not dismissal. See Rubino, 602 N.W.2d at 564. *384 Compare Iowa Code § 718.8(2) (establishing first-degree burglary as a class “B” felony), with id. § 713.5(2) (establishing second-degree burglary as a class “C” felony), with id. § 713.6A(1) (establishing third-degree burglary as a class “D” felony or an aggravated misdemeanor). Apparently, the majority is not prepared to recognize the modern definitions and degrees of burglary, instead focusing on its own definition and interpretation of occupied structure.
There was substantial evidence in this record for the district court to instruct the jury on both alternative definitions of occupied structure, and correspondingly to support the jury’s verdict on either of the two alternative definitions. I would affirm the decision of the court of appeals and the judgment of the district court.
WATERMAN and MANSFIELD, JJ„ join this dissent.